UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X

ALAN MEYERS,

    Plaintiff,

  - against -

REVLON, INC. and REVLON CONSUMER
PRODUCTS CORPORATION,

    Defendants.

---------------------------------------X

14 Civ. ___

COMPLAINT

PLAINTIFF DEMANDS A
TRIAL BY JURY

  Plaintiff Alan Meyers ("Meyers" or "plaintiff"), by his attorneys, Vladeck, Waldman, Elias & Engelhard, P.C., complaining of defendants Revlon, Inc. and Revlon Consumer Products Corporation (collectively "defendants" or "Revlon"), alleges:

### NATURE OF CLAIMS

  1. Meyers is a highly-regarded and well-established senior executive in the cosmetics industry. During his 35-year career, he has worked his way from an entry-level chemist position to Chief Science Officer of Revlon, one of the world's leading cosmetics companies. He has won several awards, including a lifetime achievement award. Products that he helped to create have been repeatedly recognized by the cosmetics industry. He has close to 20 patents in his name for products he developed. Meyers's professional success continued after he joined Revlon as its Chief Science Officer in January 2010. Indeed, his career progressed without impediment until November 2013, when Revlon appointed Lorenzo Delpani ("Delpani") as Chief Executive Officer ("CEO") and President of both Revlon, Inc. and Revlon Consumer Products Corporation.

2. Soon after Delpani's appointment, Meyers raised concerns about safety and compliance problems regarding Revlon's newly acquired laboratories. Delpani was angry at Meyers for raising these issues. He warned Meyers to refrain from further discussion of the subject, because Delpani wanted "plausible deniability" in case there were problems. When Meyers took steps to make sure the laboratories were compliant with applicable laws and regulations, Delpani accused Meyers and his team of raising "ghost" safety problems and slowing down development and production. Delpani also asked Meyers on multiple occasions to remove an email from the company's system that Meyers sent regarding quality control concerns.

3. In addition, reflecting his Anti-American and Anti-Semitic biases, Delpani treated Meyers differently than the other senior executives. At the time he was fired, Meyers was one of two members of the Revlon global leadership team born in the United States and the only team member of Jewish ancestry and faith. Since assuming the role of CEO and President, Delpani (who was born in Italy and is not Jewish) repeatedly made discriminatory comments about the United States and Americans as well as derogatory comments about Jewish executives. For example, on more than one occasion, Delpani compared the United States with ISIS (the Islamic State of Iraq and Syria), saying that the United States was only slightly better than ISIS and he often referred to Americans as "small-minded" and "dirty." Delpani also told senior executives, in sum and substance, that he was surprised that there are so few Jewish senior executives at Revlon since "Jews stick together" and, "thankfully," Ronald Perelman ("Perelman"), who is an Orthodox Jew and the controlling shareholder of Revlon, "is not like that anymore."

4. Delpani's hostility toward Meyers went on for almost a year, during which Delpani took pains to humiliate and intimidate Meyers. Delpani frequently yelled at Meyers in front of other senior executives and threatened to fire him, denied Meyers certain equity awarded to other senior executives, and, on one occasion, used him as a human easel to hold a poster board during a high-level meeting that lasted approximately 30 minutes. Several senior executives, including the General Counsel, witnessed much of Delpani's conduct, including the discriminatory and retaliatory comments, but nothing was done to rein in Delpani. As a result of Delpani's treatment, Meyers's health suffered, including a three-day hospitalization due to chest pains. Left with no reasonable alternative, Meyers engaged an attorney to press his complaints of harassment, discrimination and retaliation. Approximately one week later, Revlon responded by firing Meyers.

5. Plaintiff brings this action to remedy discrimination on the basis of his race/ethnicity and retaliation for opposition to unlawful practices, in violation of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981").

6. Plaintiff also brings this action to remedy race/ethnicity/national origin discrimination in violation of the New York State Human Rights Law, N.Y. Exec. Law §296 et seq. (the "NYSHRL"), the Administrative Code of the City of New York § 8-107 et seq. (the "NYCHRL"), and the New Jersey Law Against Discrimination, N.J. Stat. Ann. § 10:5-1 et seq. ("NJLAD").

7. In addition, plaintiff brings this complaint, pursuant to the New Jersey Conscientious Employee Protection Act, N.J.S.A. 34:19-1 et seq. ("CEPA"), to remedy defendants' retaliation against him for his disclosure to the CEO of practices that he reasonably

believed to be in violation of a law, rule, or regulation, and for plaintiff's objection to practices he reasonably believed to be in violation of a law, rule or regulation, or contrary to public policy.

8. Plaintiff also brings this action against Revlon to remedy unlawful interference with the exercise of his rights, and discrimination and retaliation against him for attempting such exercise, in violation of the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq. ("FMLA").

## JURISDICTION AND VENUE

9. This Court has jurisdiction over plaintiff's Section 1981 and FMLA claims under 28 U.S.C. § 1131.

10. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over plaintiff's NYSHRL, NYCHRL, and NJLAD claims because these claims closely relate to the Section 1981 and FMLA claims, having arisen out from a common nucleus of operative facts, such that all claims form part of the same case or controversy.

11. This Court also has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332. This includes diversity jurisdiction regarding plaintiff's CEPA claims. Plaintiff's domicile is New Jersey. Revlon, Inc. and Revlon Consumer Products Corporation are both Delaware corporations with headquarters in New York, New York. Plaintiff's damages, exclusive of interest and costs, exceed $75,000.

12. Pursuant to § 8-502(c) of the New York City Human Rights Law ("NYCHRL"), prior to filing this Complaint, plaintiff served a copy of the Complaint on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.

13. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because both defendants reside in and do business in New York, New York and some of the acts of discrimination and retaliation occurred in New York.

## PARTIES

14. Meyers is a United States citizen of Jewish ancestry and faith. At all relevant times, Meyers was the Executive Vice President and Chief Science Officer of Revlon. Meyers resides in New Jersey and worked in both New Jersey and New York during his tenure with Revlon.

15. On information and belief, defendant Revlon, Inc. conducts its business exclusively through its direct wholly-owned operating subsidiary, defendant Revlon Consumer Products Corporation. On information and belief, defendant Revlon, Inc. is a publicly-owned corporation organized under the laws of the State of Delaware with headquarters in New York City. Revlon, Inc. is a global cosmetics, skin care, fragrance, and personal care company founded in 1932. Perelman is the Chairman of the Board of Revlon, Inc. and Chairman and CEO of MacAndrews & Forbes Holdings, Inc. ("MacAndrews & Forbes"), Revlon's largest shareholder.

16. On information and belief, defendant Revlon Consumer Products Corporation is a wholly-owned subsidiary of defendant Revlon, Inc. Revlon Consumer Products Corporation is organized under the laws of the State of Delaware, with its principal place of business in New York, New York.

## FACTUAL ALLEGATIONS

### Background

17. Meyers has a Bachelor of Science degree from Wagner College, which he

5

received in 1979.

18. Immediately after graduating college in 1979, Meyers began a career in the cosmetics industry. He started working for Revlon in an entry-level chemist position, as an Associate Chemist in the Color Cosmetics laboratory. In this role, he was responsible for developing formulas. In 1981, he moved to Cosmair (L'Oreal) where he was elevated to the role of Senior Chemist in the Color Cosmetics laboratory. In 1983, Meyers joined Avon Products, where he continued to develop his skills and professional reputation and was promoted to a supervisory position in the lab. His last position at Avon was Section Manager of the Color Cosmetics laboratory.

19. In 1988, plaintiff began work for Elizabeth Arden Cosmetics Company ("Elizabeth Arden") as Director in the Color Cosmetics group. Elizabeth Arden, which was acquired by Unilever in 1990, is a cosmetics and fragrance company that has been in existence for over 100 years. Elizabeth Arden specifically recruited Meyers to build its Color Cosmetics laboratory. In or around 1990, he was promoted to Vice President of Product Development and, in 1999, to Senior Vice President of Research and Development. During his tenure at Elizabeth Arden, Meyers led efforts to develop new technologies and synthesize new molecules and product forms. He also had safety and compliance responsibilities.

20. In 2000, Meyers joined L'Oreal, the largest cosmetics company in the world. Meyers worked there for approximately nine years. He initially served as Senior Vice President of Central Functions and Consumer Affairs. In that role, Meyers supervised and managed infrastructure for the Research and Development department of L'Oreal's United States brands. Part of his responsibilities included monitoring safety and regulatory compliance. In

addition, Meyers headed the customer service division of L'Oreal's United States brands. He also helped assess the viability of potential acquisitions and assisted with brand integration, including brands such as Kiehl's, SkinCeuticals and Pureology.

21. In 2003, L'Oreal promoted plaintiff to Senior Vice President of Research and Development and Consumer Affairs. In this capacity, his duties expanded to include all of L'Oreal's Research and Development functions for its United States brands. He managed a $100 million budget and a staff of more than 350 employees, and he had global safety and compliance responsibilities for L'Oreal United States products. He also served on L'Oreal's United States Executive Committee and the Research and Development Executive Committee in France, where L'Oreal is headquartered.

22. At L'Oreal, Meyers enjoyed numerous achievements. For example, he led the development of four new FDA-approved sun care products. This was the first FDA-approved sun care product in over 20 years and, on information and belief, the first time a cosmetics company had produced such a product. In addition, at L'Oreal, he helped increase formula development by 40 percent in five years, improved the number of patent applications by approximately 50 percent, and reduced personnel turnover by 60 percent. He also helped establish L'Oreal's Ethnic Hair and Skin Institute in Chicago.

23. In addition to his work at top cosmetics companies, between 2006 and 2007, Meyers served as Chairman of the Science and Advisory Committee for what was then-called the Cosmetic, Toiletry, and Fragrance Association and has since been renamed the Personal Care Products Council (the "Council"). The Council is the leading national trade association that represents the global cosmetic and personal care products industry. While

serving as Chairman of the Science and Advisory Committee, among other accomplishments, Meyers helped develop a system to streamline the review process for the Cosmetic Ingredient Review board.

24. As a result of his success, Meyers has received numerous awards during his career, and the industry has repeatedly recognized products that he helped develop. He also has close to 20 patents in his name for products he developed.

25. In 2005, Meyers received the Lifetime Achievement Award for product development from the Health and Beauty Association of America ("HBAA"). At that time, Meyers was the youngest recipient of that award.

Meyers Returns to Revlon

26. Revlon is one of the world's leading cosmetics companies. It also manufactures skin care products, fragrances, and personal care items.

27. In or around October 2008, Revlon began actively recruiting Meyers to leave L'Oreal and join Revlon as Chief Science Officer. At that time, David Kennedy ("Kennedy") was the CEO of Revlon.

28. When Revlon initially approached Meyers, he had no intention of leaving L'Oreal. To entice Meyers to join Revlon, Revlon offered Meyers substantially more compensation than he was earning at L'Oreal. In addition, at the time Revlon was recruiting Meyers, Revlon's then-Chief Science Officer did not report directly to the CEO. Revlon agreed to elevate the position so that Meyers would report directly to the CEO. Furthermore, because Meyers had a non-competition agreement with L'Oreal, Revlon offered to "defend and indemnify" Meyers in connection with any dispute over that agreement.

29. Meyers left L'Oreal in or around December 2008. When L'Oreal invoked the non-competition agreement threatening Revlon and Meyers with legal action, Revlon agreed to hold open the offer until June 30, 2010.

30. On March 5, 2009, Revlon announced that Meyers would be joining the company on January 1, 2010. The announcement, among other things, provided: "We are delighted to have an executive of Alan Meyers' expertise and capability, with his long and deep experience in the field of cosmetics . . . ."

Meyers's Success at Revlon

31. Meyers began working for Revlon on January 10, 2010. When he joined the company, he reported directly to the then-CEO Alan Ennis ("Ennis"). Ennis took over as CEO from Kennedy in May 2009. Kennedy moved to a senior position at MacAndrews & Forbes. Currently, Kennedy is Senior Executive Vice President of MacAndrews & Forbes, and serves as Vice Chairman of the Board of Revlon, Inc.

32. As Chief Science Officer, Meyers was responsible for development of all products that the Revlon brands sold worldwide. He led the global effort to formulate new cosmetics products. He was also responsible for quality control and assurance, as well as regulatory and safety compliance.

33. In or around 2011, Ennis expanded Meyers's duties to include the Packaging division. In this capacity, Meyers was in charge of, inter alia, development of the package, including engineering, for all Revlon products, program management for Revlon projects, and protection of products for shipping purposes.

34. Throughout his employment at Revlon, Meyers was also a member of the senior leadership team, which was previously called the Operating Committee and now is referred to as the Global Leadership Team (the "GLT" team). The GLT team is involved in all high-level decision-making for Revlon, including personnel issues for executive employees, profit and loss considerations, marketing strategies, and potential acquisitions.

35. Meyers worked in both New York and New Jersey during his tenure at Revlon. He spent approximately 70 percent of his time in New Jersey and 30 percent of his time in New York. He had offices located in both states and there were employees who worked in both states and who reported to him. In New York, Meyers regularly attended senior-level meetings, including CEO meetings (such as GLT team meetings) and meetings with the Head of Packing Development and executives within the Product Development Marketing department. In New Jersey, Meyers managed Revlon's Edison laboratory. He conducted meetings face-to-face with laboratory heads. In addition, in New Jersey, Meyers met with team leaders to discuss important development programs and innovation ideas, and to address challenges that occurred during the development process. As set forth below, Revlon subjected Meyers to unlawful discrimination and retaliation in both New York and New Jersey.

36. At Revlon, Meyers continued to enjoy professional success and received praise for his performance. Throughout his employment, Meyers consistently received positive performance evaluations, which were based on his individual performance as well as the company's performance.

37. In his performance review for 2011, Ennis rated Meyers's overall performance as a "5" out of a possible "6." In the comments section of his review, Ennis stated

that "[o]verall, [he was] extremely pleased with [Meyers's] performance in 2011 and look[ed] forward to working with him in 2012."

38. For 2012, Meyers received an overall score of "4" out of "6." Ennis's comments included, among other things: "As a company, 2012 was a year of many accomplishments of which you should be proud, [Meyers]. Our leadership team worked very well together and collaborated to deliver these strong results"; "[Meyers], you and your team have been at the center of our innovation process for the last three years. We have progressed leaps and bounds in this regard under your leadership."; and "[Meyers], you are a critical member of our leadership team and I very much enjoy interacting with you."

39. Meyers received a mid-year assessment in June 2013, which was the last written review given to him. He received an overall score of "4" out of "6."

40. In addition, since Meyers joined the leadership team at Revlon, on information and belief, Revlon's profits have grown substantially.

41. Due to his strong performance, Meyers received regular raises and bonuses throughout his employment at Revlon.

42. Even after Delpani's discrimination and retaliation described below, Meyers continued to perform well in 2014. According to a report released by Nielsen in or around November 2014, Revlon had more top-10 product launches year-to-date than any other brand, and more top-10 selling products than it has had in the previous two years.

43. In 2014, Revlon received numerous awards for products developed by Meyers's team. For example, during the fall 2014, Allure, a United States women's beauty magazine, awarded Revlon with its annual Best of Beauty Award for mascara. This was an

11

important award for Revlon because it had been many years since Revlon was honored in this category and mascara represented a key growth opportunity for the company. Revlon also received Best of Beauty Awards for eyeliner, two lip products, and a facial product.

44. Even though Revlon has fewer chemists in Edison, New Jersey compared with its competitors L'Oreal, Cover Girl, and Coty, its laboratory consistently develops innovative base formulas for products as well as unique and patentable molecules. These developments are the building blocks of successful cosmetic products. In 2014, Revlon launched several new items and technologies, including wax-free lipstick, improved aesthetics in its ColorStay foundation (which is now a number one selling product in Japan – a critical market for foundation), PhotoReady airbrush liquid foundation, and long-lasting nail enamel. Additionally, Revlon has several formulas and products in development that senior executives, including Delpani, are excited about.

45. In 2014, Meyers was given several objectives which he was on track to reach at the time he was fired in December 2014. For example, his objective for saving costs for his groups was set at $300,000. As of December 2014, Meyers was on pace for savings in the amount of $1.46 million.

<u>Revlon's Acquisition of Colomer</u>

46. In or around August 2013, Revlon announced the acquisition of The Colomer Group ("Colomer"), a company based in Spain. Colomer was a beauty care company that sold professional products primarily to salons and through other professional channels. At the time of the acquisition, Delpani was CEO of Colomer. Colomer's annual sales were estimated at approximately $500 million, which was about one third of Revlon's annual sales.

47. In early October 2013, Ennis resigned as CEO of Revlon and Kennedy was appointed interim CEO.

48. On or about November 1, 2013, Delpani was named CEO and President of Revlon, Inc., and CEO and President of Revlon Consumer Products Corporation. He is also a member of the Revlon Board of Directors. Delpani reports to Perelman.

49. Following its acquisition of Colomer, Revlon engaged in a substantial (and ongoing) effort to integrate the two companies and Meyers played an active role in this process. Among other duties, Meyers was responsible for integrating Colomer's laboratories and building a global Research and Development division. Colomer had five laboratories at the time of the acquisition, including laboratories located in Spain, California, Florida, Mexico and Italy; Revlon had just one laboratory in Edison, New Jersey. In contrast to Revlon, the Colomer laboratories were for the most part run independently.

50. For purposes of global integration, Meyers developed and implemented the "centers of excellence" model. Meyers started this integration process in January 2014 and it was ongoing at the time Revlon discharged him. Meyers consolidated the laboratories so that most of the work for Revlon would be performed in the laboratories in Edison and Barcelona. Meyers transferred the majority of research and development for color cosmetics, anti-perspirant, nail enamel, and facial care to the New Jersey laboratory. Under this system, the Barcelona laboratory would handle the majority of hair products. As a result, Revlon would be able to focus on product development independent of brand and, in the event of future acquisitions, there would be a system in place to integrate the new organization. Delpani expressed support for this method of organization.

### Meyers's Safety and Regulatory Concerns

51.     As Chief Science Officer, Meyers was responsible for ensuring that the recently acquired Colomer laboratories were compliant with applicable law. Almost immediately, Meyers discovered problems with the Barcelona facilities.

52.     Meyers was particularly concerned about the raw materials that Colomer used to manufacture products, which he believed did not satisfy regulatory and safety requirements. In addition, Meyers was concerned that the Colomer laboratories were not equipped to adequately test raw materials to satisfy Revlon's more rigorous standards. At the time of acquisition, the Barcelona laboratory had no toxicologists and, at best, basic safety testing. Moreover, Colomer's Operations group was responsible for raw materials, which Meyers worried created a conflict of interest. An operations group generally focuses on costs for producing products and therefore looks to use the lowest cost materials regardless of quality or safety concerns.

53.     On several occasions between November 2013 and January 2014, Meyers advised Delpani of safety and regulatory concerns regarding the Colomer organization in Barcelona.

54.     It became clear to Meyers that Delpani was angry at him for raising these issues. When Meyers voiced these concerns about the Barcelona lab during an Integration meeting in or around November 2013, Delpani accused Meyers of "throwing bullets" at him.

55.     After Meyers raised these issues, on numerous occasions, Delpani threatened Meyers and his staff. In January 2014, Meyers attended an off-site General Managers'

653202 v1

meeting in Florida. During this meeting, Delpani pointed to Meyers in front of more than 250 attendees and warned Meyers not to fabricate safety issues. On another occasion, on information and belief, Delpani told the Vice President of Safety, Regulatory and Quality not to raise "ghost" safety problems.

56. Delpani later told Meyers on multiple occasions that Delpani needs "plausible deniability" regarding safety and regulatory issues and instructed Meyers never to speak to him in public about those concerns.

57. Even though Delpani made clear that he was angry at Meyers for raising these concerns, Meyers pursued and exhausted all means of securing compliance and attempted to enforce the processes and procedures created to ensure that the company did not violate the applicable safety rules. Meyers did so despite Delpani's threats because he worked for the company, not Delpani, and it was his responsibility as Chief Science Officer to ensure the safety and integrity of Revlon products on behalf of the company and the consumer.

58. At the time of his discharge, Meyers had successfully implemented the changes, some of which were ongoing, necessary for the Barcelona laboratory to be compliant with applicable laws and regulations. Among other changes, Meyers helped implement an electronic system in the Barcelona laboratory that was already used in the United States, to ensure safety and regulatory compliance and help avoid patent infringement issues. Meyers also hired chemical engineers to oversee the improvements to the Barcelona lab and enhance the quality of the finished product.

59. In response to Meyers's efforts to ensure legal and regulatory compliance, on multiple occasions Delpani accused Meyers of slowing down development and production.

Likewise, on or about September 13, 2014, Delpani told Meyers in front of a colleague that the Chief Marketing Officer in Barcelona believed Meyers "ha[d] nothing to add except complexity."

60. When Meyers raised other safety concerns, Delpani's reaction was the same. Senior executives and marketing team leaders met once per month to discuss marketing and branding strategies, new products, and other important matters. These monthly meetings were called "Innovation" meetings. At the May 2014 Innovation meeting, Meyers expressed concern about bringing a certain hair color product to the retail segment from the professional segment because of the amount of peroxide. During the Innovation meeting, in front of approximately 18 team members, Delpani screamed at Meyers for about 30 minutes for raising these concerns. After the meeting, Delpani again instructed Meyers not to raise safety issues in public because he needed "plausible deniability."

61. Shortly thereafter, in or around May 2014, Delpani scheduled a meeting among Delpani, Meyers, and Lucinda Treat ("Treat"), Executive Vice President and Chief Legal, Human Resources, Compliance and Corporate Affairs Officer. Meyers believed he would be fired during this meeting. Although he was not fired, Delpani directed Meyers to advise Treat that there were no problems with the hair product discussed during the Innovation meeting and that the product was safe for retail sale. Delpani directed Meyers to make a similar statement to the attendees of the June 2014 Innovation meeting. Meyers, worried about his job, made the statements based on Delpani's instructions. Meyers, however, ultimately prevented the hair care product from being sold on the retail market.

62. Also, in May 2014, Meyers sent an email to Delpani about quality concerns related to Revlon's North Carolina manufacturing factory. Meyers sent the email in response to issues that Delpani had raised. Meyers explained that the problems were due to a number of factors, including insufficient equipment and personnel. In response, Delpani told Meyers that he did not want Meyers's email on the company's email system. Twice in June and in September 2014, Delpani asked Meyers to work with Treat to remove Meyers's email message from company records. Although Meyers did not remove the message from the system, he was worried that once again Delpani was asking Meyers to engage in wrongdoing.

63. On or about October 21, 2014, Meyers met with Delpani to discuss the importation of certain products to the United States. Meyers gave Delpani a list of the products and explained that due to patent issues there would be some delay. Delpani chastised Meyers for presenting the list to him. Delpani again explained that he needed "plausible deniability" regarding all compliance and related issues. Delpani said he did not want anything in writing and not to involve him with these types of issues. After Meyers explained that the written document contained only a list of materials and not a description of his patent concerns, Delpani accepted the written document and stopped chastising Meyers.

### Delpani's Anti-American and Anti-Semitic Biases

64. Meyers was treated differently than other GLT team members because he is Jewish and was born in the United States. As of December 2014, there were nine members of the GLT team. This included Delpani, President and Chief Executive Officer, and Treat, Executive Vice President Chief Legal, Human Resources, Compliance and Corporate Affairs Officer. Other than Treat (who was hired by Delpani), Meyers is the only American on the GLT team and

he is the only team member of Jewish ancestry and faith. The other GLT members, the majority of whom Delpani appointed, are Spanish or Italian.

65. In or around October 2014, Delpani fired the then-Chief Financial Officer ("CFO"), a United States citizen. Delpani appointed a new CFO who was born in Spain and is approximately 40 years old. Delpani paid the new CFO $100,000 more than Meyers, and, among other compensation, gave him 75,000 shares of restricted stock.

66. From the beginning, Delpani created, and defendants knowingly tolerated, an abusive environment where discriminatory comments were commonplace. In particular, Delpani made countless negative comments about the United States and American citizens. For example, in April 2014, during a meeting with several senior executives in attendance, including Treat, Delpani drew a bathtub to describe a profits issue. He explained after the meeting that the tub he drew was an Italian tub. He further explained that if it was an American tub, he would have to draw it in the dirt and then proceeded to draw dirt around the tub.

67. At numerous high-level meetings, Delpani commented that the United States is not the "land of the free" and that Americans are "small-minded" people.

68. On or about August 26, 2014, in front of the Head of Fragrance and a long-term consultant, Delpani told Meyers to "shut up." Delpani then explained to Meyers, the Head of Fragrance, and the consultant that Americans were slightly better than ISIS, that he hates living in the United States, and that he cannot wait to return to a "real" country.

69. In October 2014, during a GLT meeting that lasted more than 12 hours, Delpani went on an anti-American tirade, saying again that America is getting closer to ISIS and

that it is not surprising that Americans are joining ISIS (which he read in a New York Times article).

70. In addition to his anti-American comments, Delpani made anti-Semitic remarks. During a GLT meeting in April 2014, Delpani expressed surprise at the lack of Jewish executives at Revlon given that "Jews stick together" and Perelman, who is Orthodox Jewish and is the controlling shareholder of the company. Delpani added, in sum and substance, "Thankfully, [Perelman] is not like that anymore."

71. Delpani repeated this sentiment again in September 2014. On or about September 10, 2014, Delpani described a meeting he had with a senior executive for a client. Delpani noted that they were both stunned, and apparently pleased, at the lack of Jewish executives at Revlon.

72. On another occasion, Delpani explained that there is a perception that Revlon is run by Jewish executives because Perelman is the controlling shareholder. Delpani claimed that because he is CEO and President of Revlon, others assume he is Jewish and that, in fact, he had been incorrectly identified on a website as Jewish, which he would fix immediately.

Other Inappropriate Conduct and Comments by Delpani

73. Throughout his tenure at Revlon, Delpani made other inappropriate comments and engaged in unprofessional conduct. Below are some examples of such conduct and comments.

74. In April 2014, Delpani visited a Revlon factory located in South Africa. On information and belief, Delpani said to other Revlon employees that he could smell a black person when he or she enters the room.

75. One of the members of the GLT team had a stroke at a young age in or around 2012. During offsite GLT meetings in late-June 2014, Delpani told the GLT team that the senior executive's wife would not allow Delpani to visit the hospital after the stroke. Delpani further explained that the stroke had been caused by the senior executive taking too much Viagra and that, as a result, he was embarrassed and would not allow visitors.

76. During an Innovation meeting, Delpani described non-Western languages, especially "Asian languages," as "uncivilized" in the presence of, among others, a Revlon Vice President who is Chinese.

77. During a GLT team meeting in September 2014, Delpani explained how it is common in Spain to get a "hand job" after a hair cut.

78. During an October 2014 GLT meeting, Delpani repeatedly hit one of the senior executives and threw an object at him. Delpani, while looking at Meyers, explained that this is how he and his team from Spain interact.

Delpani's Additional Discriminatory and Retaliatory Treatment

79. On numerous occasions, after Meyers raised concerns regarding safety and compliance issues, Delpani threatened to fire Meyers, demeaned Meyers during meetings in front of other employees, and questioned his loyalty.

80. In early 2014, Meyers proposed selling as a Revlon product a successful top coat nail polish brand that Revlon acquired in the purchase of Colomer. In deciding whether this was a viable option, a critical question was whether the top coat should be sold in connection with Revlon's newly-developed Color Stay Nail Enamel. Testing the products together, however, revealed that they were not compatible. Meyers asked the team to wait to advise

20